Aiken v. Suttle.

4L 103
9L 101
13L 488
4pi 506

EVELINA E. C. AIKEN v. GEORGE E. SUTTLE et. al.

1. MARRIED WOMAN. *Power of attorney of.* A married woman's power of attorney for the sale of her lands is invalid.

2. SAME. *Divorce, effect of.* The purchaser of the husband's interest in the wife's lands, prior to the Act of 1849-50, ch. 36, sec. 1, Code, sec. 2481, abridging the husband's power of disposition, took it as it then stood, and without reference to the contingency of a subsequent divorce at the wife's instance, which, therefore, had no effect upon the rights of such purchaser.

3. STATUTE OF LIMITATIONS. *Remainder.* The statute of limitations does not run against a remainder-man until, by the termination of the particular estate, the right of possession has accrued.

4. CHANCERY JURISDICTION. *Cloud on remainder.* A bill will lie to remove a cloud from a remainder in lands.

5. SAME, *Invalid sale, condition of avoidance.* Upon the avoidance of a sale of lands, where the purchaser has been guiltless of fraud or imposition, the holders of the lands under the sale, whether the original vendees or their successors in interest by descent or purchase, with or without warranty, are entitled to have the lands charged in their favor with a proper restitution of the purchase money paid upon the sale that is avoided.

6. SAME. *Same. Same. Amount of restitution* The amount of this restitution will be that of the purchase money paid upon this sale, with interest, but not exceeding (if the lands have been subsequently sold) the amount of the purchase money paid at the last sale (with or without warranty), with interest.

7. CHANCERY PLEADING AND PRACTICE. *Parties.* To a bill for the purpose of avoiding the sale of the lands, and of reclaiming them, in a case where there can be no account of rents and profits, only the holders of the lands at the time, under the sale, are necessary parties. The original or intermediate vendees with warranties of title are proper, but not necessary, parties.

Aiken *v.* Suttle.

8. STATEMENT. *Application.* In 1846, 92 acres of certain lands, belonging jointly to complainant, then the wife of C. K. G., and her two brothers, were sold to J. B., and in 1847, 147 acres to R. C. S., complainant's interest being conveyed in each instance under a power of attorney executed by her husband and herself, with her privy examination. In 1857, J. B. conveyed his 92 acres to R C. S. During that year complainant obtained a divorce *a vinculo* from C. K. G., for his fault, after which she married J. A. A., whose widow she now is. After the death of R. C. S., 100 acres of the 147 purchased by him in 1847 were sold (as included in a larger tract) under a decree in settlement of his estate, and purchased by L. D. S. The bill was filed in 1875 against the widow and the real representatives of R. C. S., and the widow and the personal and real representatives of L. D. S., to have said powers of attorney, and said conveyances thereunder, etc., annulled, as clouds upon complainant's title in remainder to an undivided one-third of the two tracts of 92 acres and 147 acres, and to have her rights in remainder declared. One-third of the purchase money paid by J. B. and by R. C. S., in 1846 and 1847, less C. K. G.'s life estate in this one-third, must be taken to have been paid on account of complainant's remainder in this portion of the lands. At the sale of the 92 acres by J. B. to R. C. S., in 1857, one-third of the purchase money, less the vendor's interest therein for the life of C. K. G., must be taken to have been paid on account of complainant's remainder in this tract. And, at the sale of the 100 acres to L. D. S. (as included in the larger tract), one-third of the purchase money applicable to the 100 acres, less the life interest therein as of that date, must be taken to have been paid on account of complainant's remainder in these 100 acres. The restitution to be charged in favor of the defendants as a lien upon complainant's interest in said lands, is what was paid on account of the remainder in 1846 and 1847, with interest, but the portion of this amount applicable to the 92 acres, and to the 100 acres of the 147, subsequently sold, not to exceed what was paid at the subsequent sales on account of the parts of the remainder involved therein, with interest from the dates of these sales respectively. And all of these sales being made without reference to any separate valuation of the life estate and the remainder, the former is to be determined, in every instance, upon the basis of the actual subsequent length of life of C. K. G.

9. IMPROVEMENTS. *Allowable when.* Improvements are allowable against the owner of lands, in favor of holders in good faith

under color of title, from whom the lands are reclaimed, only as an offset against rents and profits. Where, as in the present case, there can be no claim for rents and profits, there can be no allowance on account of improvements.

---

FROM GILES.

---

Appeal from Chancery Court at Pulaski. W. S. FLEMING, Ch.

NOBLE SMITHSON and THOS. H. MALONE, for Complainants.

JOHN S. WILKES, for Defendants.

R. McPHAIL SMITH, Sp. J., delivered the opinion of the Court.

In 1845, complainant, then the wife of C. K. Gillespie, being seized jointly with her two brothers, N. G. Taylor and A. M. C. Taylor, of a tract of land in Giles county, united with her husband in a power of attorney to her two brothers, authorizing them, or either of them if they could not act jointly, to sell and convey her undivided share of the tract; and in 1846, they, on their own behalf, and N. G. Taylor, acting on behalf of complainant and her husband, under this power of attorney, sold and conveyed to John Black, with warranty of title, 92 acres of the tract.

In 1847, complainant and her husband and A. M. C. Taylor executed a power of attorney to N. G. Taylor, authorizing him to sell and convey the interests of complainant and A. M. C. Taylor in

the tract; and during that year, N. G. Taylor on his own behalf, and under this power of attorney, sold and conveyed another portion of the tract, containing 147 acres, to R. C. Suttle, also with warranty of title. Complainant was privily examined as to her execution of both powers of attorney.

In 1857, John Black conveyed the 92 acres he had purchased to R. C. Suttle, with warranty of title. After the death of R. C. Suttle, a tract of 508½ acres belonging to his estate, containing 100 acres of the tract of 147 acres purchased by him in 1847, as stated, was sold under a decree, in settlement of his estate, according to the provisions of his will, and purchased by L. D. Suttle, who dying in 1873, the tract passed to his heirs, subject to his widow's dower. The residue of this tract of 147 acres, together with the tract of 92 acres purchased of Black by R. C. Suttle, is held in common by the devisees of the latter, subject to his widow's dower.

The defendants are the widow and the real representatives of R. C. Suttle, and the widow and the real and personal representatives of L. D. Suttle.

In 1857, complainant, having lived with her husband for some twenty years, and borne him several children capable of inheriting, obtained a divorce from him upon the ground of his malicious desertion of her, the decree restoring to her all the rights of a *feme sole*. Afterwards she married

Aiken *v.* Suttle.

John Alfred Aiken, whose widow she now is. C̓
K. Gillespie is still alive.

The bill, after setting forth these matters in minute detail, urges the invalidity as to complainant of these powers of attorney and conveyances, she having been a *feme covert* at the time of their execution, and prays to have them annulled, as a cloud upon her title in remainder, after the death of her former husband, C. K. Gillespie, to an undivided one-third of the lands conveyed.

The defendants concede the invalidity as to complainant of these instruments, but they insist that she had, at the commencement of this suit, in 1875, no interest in these lands, to have a cloud removed from. If her interest were conceded, there would be no controversy about the cloud. The case turns upon the question of her interest.

It is argued for the defendants that these instruments, invalid as to complainant, passed only her husband's interest, as husband and tenant by the courtesy initiate, in her share of the lands in question, and that his conveyees took his interest subject to be defeated by any of the contingencies that would have ended it in his hands if he had retained it, and, among others, by the termination of the coverture by a divorce at the wife's instance. That, therefore, upon the divorce, in 1857, complainant became entitled immediately to recover her share of these lands, just as if her husband had then died, and that not having sued until

1875, she was then estopped by her laches and barred by the statute of limitations.

This consequence certainly happened if complainant was entitled to reclaim her interest in these lands immediately after the divorce in 1857. The question is, whether she *was* so entitled.

Many weighty authorities are cited in the affirmative of this question, and it is conceded by the counsel of complainant that it is the better view, if the matter were *res integra.* They point out that it is the view that was taken by complainant herself, who acted upon it in her suit against A. B. Worford, reported in 6 Cold., 632, in which, however, this Court held that the divorce in 1857 did not affect the interest of her husband's conveyees and their successors in interest in other lands similarly disposed of. They show also that complainant afterwards brought a second suit, in which, succumbing to the ruling of *Gillespie* v. *Worford* upon this point, success was sought through the supposed effect of the Act of 1849-50, chap. 36, sec. 1, but that the result was again adverse to the complainant, by the decision of this Court at Jackson, in 1871, the style of the case being *Aiken* v. *Mumford*, the opinion having been delivered by Judge Turney. They insist that while the only point expressly passed upon in this case was as to the effect of the Act of 1849-50, yet, as the decision could not have been adverse to her except upon the assumption of the correctness of the ruling in *Gillespie*

v. *Worford* upon the point in question, therefore this must be taken to have been approved in *Aiken* **v.** *Mumford,* and they urge that complainant having been twice defeated by this ruling, is now entitled to invoke its protection.

For the defendant it is insisted, and this seems to have been the Chancellor's opinion, that *Aiken* **v.** *Mumford* is an authority only upon the one point expressly passed upon by the Court therein, and that *Gillespie* v. *Worford* is an isolated decision upon the point in question, which is glaringly erroneous, and ought to be overruled. Whether *Gillespie* **v.** *Worford* ought to be overruled upon this point, is what we have now to determine.

If the doctrine of this case be sound, that the rights of C. K. Gillespie's conveyees and their successors in interest in the lands of his wife were unaffected by the subsequent divorce decree, then, complainant's interest being only a remainder after the death of C. K. Gillespie, who is yet alive, she has been guilty of no laches, and is not barred. For, in this view, the statute of limitations could not run against her until after the termination of the particular estate by the death of C. K. Gillespie: *Miller* **v.** *Miller,* Meigs, 484; *McCorry* v. *King's Heirs,* 3 Hum., 267. She was not bound to sue until her right to possession should have accrued.

Nevertheless, at any time prior thereto, she might sue to have a cloud removed from her remainder interest, and to have her rights declared. A remainder-man is not obliged to wait until the right

of possession has accrued, but may have a cloud removed during the existence of the particular estate: *Coleman* v. *Satterfield,* 2 Head, 259; *Dodd* v. *Benthal,* 4 Heis., 608; *Cantrell* v. *Davidson County,* 3 Tenn., Chan., 426.

In *Gillespie* v. *Worford,* it was conceded that the bill was properly filed, in so far as it sought only to have the deed set up by the defendant, as an assurance in fee, removed, as a cloud upon complainant's title after the termination of the estate by courtesy.

A remainder is a present right, though the enjoyment is future, and the owner may desire to dispose of it, or in some way to make it available to his needs, and he is entitled to have it relieved from a cloud impairing its value, and perhaps rendering it wholly unavailable.

In the inquiry as to the effect of a divorce a *vinculo,* for a cause arising after the marriage, upon the rights of a purchaser during the coverture of the husband's interest in the wife's realty prior to the Act of 1849-50, no material aid is to be derived from the common law authorities, because in England divorces a *vinculo* were granted only for causes sufficient by the ecclesiastical law to avoid the marriage *ab initio.* Where the supposed husband had aliened the lands of the supposed wife, and a divorce was afterwards obtained, it was thereby adjudged that there never had been any valid marriage, and of course the woman's rights remained unaffected by the abortive alienation.

Aiken *v* Suttle.

Divorces *a vinculo* for supervenient causes were introduced into this country by the legislation of the separate States. It lay, of course, with them, each one for itself, according to its views of sound policy, to determine for what causes such divorces should be granted, and also to regulate their con-sequences, both as to personal status and property rights.

Where the consequences were not expressly pre-scribed by legislation, they had, of course, to be determined according to the policy of the given State, as gathered from the legislation or otherwise; and where no rule could be thus deduced, then according to legal reason and analogy. Different views of policy might have been expected to ob-tain in different States. Our own legislation has, to some extent, regulated the consequences of such divorces. Code, secs. 2468, 2477.

Thus, where the divorce is obtained by the wife, the Court may decree her maintenance by the hus-band, or out of his property, real or personal, as it may think proper. If at the time of the divorce the wife has any property accrued by her own in-dustry, or by gift, devise, descent, or distribution, she is to have this absolutely, subject, however, to the rights of creditors who became such during the coverture

If the divorce is obtained by the husband, his interest in the wife's lands is not to be affected thereby, and in case she survives him, she is not to be entitled to dower, nor is she to take any

share of his personalty in the event of his intestacy; and in one case she is rendered incapable thereafter of alienating any of her lands.

In *Allen* v. *McCullough*, 2 Heis., 174, it was held that the effect of the provision protecting the rights of creditors was to keep the husband liable after the divorce for the wife's debts contracted *dum sola*, from which her death would have released him; and on page 188, Judge Nelson, who delivered the opinion of the Court, considered that the provision depriving the wife, divorced at her husband's instance, of dower and of a distributive share in the event of his intestacy, manifested that, in the view of the Legislature, she would, in the absence of such a provision, have remained entitled to these rights of a wife, notwithstanding the divorce.

In *Chunn* v. *Chunn*, Meigs, 137, the Court independently of legislation, upon granting a divorce *a vinculo*, had due regard to the rights of creditors; and in *McGhee* v. *McGhee*, 2 Sneed, 221, it was said that, independently of legislation, "upon well established general principles of law, the claims of the husband's *bona fide* creditors, or liabilities properly incurred in his behalf, existing prior to the application for divorce, must prevail over the rights of the wife." The property here was both real and personal, and most of it had come by the wife, and the divorce was obtained by her.

But in *Ames* v. *Norman*, 4 Sneed, 683, decided in 1857, the very year in which the complainant obtained her divorce, the point now under considera-

Aiken *v.* Suttle.

tion was directly passed upon. A tract of land held by the husband and wife jointly, by entireties, had been levied on and sold for the husband's debt, and afterwards a divorce *a vinculo* had been obtained by the wife. The question was as to the effect of the divorce upon the purchaser's rights. Upon the theory now maintained in behalf of the defendants, the effect was the same as if the husband had died at the time of the divorce. But the Court, while, of course, conceding that if the husband had still held his interest, the divorce which made the parties "*twain,*" would have transformed the tenure by entireties into one by moieties, yet held that the purchaser's rights were unaffected by the divorce. Judge McKinney, who delivered the opinion of the Court, said, on page 694:

"The decree in this case would seem to take it for granted that, upon a dissolution of the marriage by a divorce at the suit of the wife, the same legal consequences follow, in all respects, as if the marriage had been dissolved by the death of the husband. This is a very erroneous assumption, so far at least as relates to the question under consideration." He added on pages 696–7:

"We are of the opinion that the subsequent divorce had no effect whatever upon the rights of such purchaser. It is true the purchaser at execution sale succeeds merely to the right of the husband in the estate; that is to say, he acquires no other or different right, either as regards the

8—VOL. 4.

quantity or quality of estate, than was possessed by the husband; and he takes it subject to all the rights, legal or equitable, existing in favor of third persons at the time of the sale. But, still, the purchaser is not to every intent and purpose placed in the shoes of the husband. On the contrary, he holds the estate independently of the husband, and of his future creditors, *and entirely free from all future accidents or contingencies that might, as against the husband, if the title had remained in him, have directly or indirectly affected the estate."*

This, and what follows, expresses the very pith of the ruling in *Gillespie* v. *Worford* upon this point:

" *The purchase in the present case was not made in view of the contingency of the wife's divorce at some future period, and cannot be affected by it.*

" The defendant, by his purchase, became invested with the right of the husband *as it existed at the time of the sale;* that is, a right to occupy and enjoy the profits of the land as owner during the joint lives of the husband and wife, subject to the contingency that, if the complainant survives her husband, his estate will then terminate, but, if the husband survives, he would then become absolute owner of the whole estate."

The doctrine of this case, in the abstract, is, that the purchaser of the husband's interest during the coverture, takes it as the husband then holds it, and retains it unaffected by a subsequent divorce. The decision must, of course, have been the same

if the husband had himself conveyed his interest to the creditor in satisfaction of the debt, or had sold it to raise money to pay the debt, or for any other purpose. The circumstance that the sale was in *invitum*, under legal process, did not make a different case from the voluntary sale of the same property by the debtor himself. The decision in *Gillespie* v. *Worford*, upon the point under consideration, was simply an application of the principle of *Ames* v. *Norman*, and it is a little remarkable that Judge Milligan, who delivered the opinion of the Court, did not refer to this case and reinforce his reasoning with its authority.

In *Allen* v. *McCullough*, 2 Heis., 189–90, Judge Nelson cited both of these cases approvingly, as equally authoritative to establish that the legal consequences of a divorce *a vinculo* are different from those of a termination of the coverture by the parties.

We have seen that *Gillespie* v. *Worford* was assumed to be the law upon the point in question, in the subsequent case of *Aiken* v. *Mumford*, brought by the same complainant, who had in the meantime became Mrs. Aiken, and who is the complainant in the present case.

The rule in question was not so devoid of considerations in its favor as seems to be conceded even by the counsel who now uphold it upon the principle of *stare decisis*. We say *was* not, because, owing to the Act of 1849–50, taking away from the husband and his creditors

the power to sell the wife's realty for his lifetime, the rule has, except indeed in the infrequent case of the tenure by entireties, become a thing of the past. Before the passage of this Act, the policy of the law was, to render the husband's interest in the wife's realty available to him and his creditors. But if it could be sold by him, or *in invitum* by his creditors, only as subject to the contingency of a divorce *a vinculo* at the wife's instance, for which several causes existed, the purchaser's tenure would have been recognized as so insecure as to have rendered the sale a sacrifice. Thus, the husband's interest would have been of little avail for disposition either to him or to his creditors. And, then, to allow the wife to reclaim the lands upon the divorce would generally have been to allow her to profit through her own fault. For even where the husband furnishes the salient cause of divorce, we should generally find, if we could see behind the scenes, that the wife has not been wholly blameless for his misconduct. It is seldom that in such cases either party is faultless. Indeed, it is quite conceivable that where a thriftless husband had squandered the lands of his wife for his lifetime, and thus reduced her and her children to destitution, he might, through his very love for his family, have afforded her a cause of divorce, the more especially as he could have done so without disgrace, by merely deserting her for two years. Then, she having obtained the divorce, and reclaimed her lands, they might have remarried.

Aiken *v.* Suttle.

What collusion there might have been in this, however · afterwards suspected, could rarely have been detected and exposed.

The purchaser could not have intervened in the divorce suit, though aware that no defence was to be made, and possessed of evidence to defeat the bill if he were allowed to produce it. And then, the divorce might have been procured in a distant part of the State, without his knowledge, or even in a distant State, to which the parties might have removed. Ought the purchaser's rights to be affected by the result of a suit between other parties, in which he could not appear?

But, whatever may be thought of the wisdom of the rule, we cannot but regard it as the deliberrate policy of our State upon the subject, however different it may be from that of our sister States, and however preferable the latter may appear to the text writers. And our disinclination to reverse it is powerfully augmented by the appeal that is now made to the principle of *stare decisis* in behalf of the present complainant, who has already twice suffered from the rule, but who might suffer perhaps even more from its reversal, which, by retroactively putting her in default, in not having seasonably enforced rights which this Court decided that she did not have, would now estop and bar her absolutely; and thus she would have been misled by this Court to the loss of her property.

We hold, then, that complainant is entitled to a remainder interest in her original share of the lands

in question.    Her right to possession will accrue
upon the death of her former husband, C. K. Gil-
lespie.    And she is entitled now to have removed
the cloud upon this remainder, arising from the
powers of attorney and the conveyances aforesaid,
which, as against her, were invalid.

It is, however, insisted that there are 192 acres
of the original tract in question remaining undisposed
of, and that complainant ought to be thrown upon
this land before being allowed to disturb the de-
fendants.

On the other hand, it is denied that any of
this original tract remains unsold.    The dispute
here is as to the dimensions of the original tract.
This is a rectangle.    One of the sides is unques-
tionably 168 poles.    The controversy is as to the
length of the other.    The language of the original
deed conveying the tract, is, as to this side, "thence
east 190 poles to the creek, crossing it, the same
continued 540 poles to a stake, &c."    The question
is whether the 540 poles are additional to, or in-
clusive of, the 190.    If additional, then this side
of the rectangle is 730 poles; if inclusive, it is
but 540.    In the former case, the tract contains
766½ acres, and the latter 567.    The deed calls for
766 acres; moreover, this tract was one of six
lots into which a larger tract was divided for par-
tition.    The other lots contained, respectively, 730,
757, 822, 766 and 766 acres.    The dimensions of
these lots corroborate the estimate of the deed
making this equivalent lot contain 766 acres, rather

Aiken *v*. Suttle.

than only 567. And, then, it appears that 574 acres have been conveyed away out of the tract— 7 acres more than the smaller estimate of the tract. On the whole, then, we take it that the tract contained 766 acres, and not merely 567.

There appears to be no trace in the Register's office of what has become of 192 acres of the tract. But, it by no means follows that they remain undisposed of by complainant and her brothers, and in view of the date of the latest of their registered deeds to other portions of the tract, March 25, 1850, some thirty years ago, this seems very un likely. If such *were* the fact it would doubtless have been clearly and affirmatively shown by the defendants, and not left to be inferred from the mere absence of records in the Register's office, a very uncertain reliance, as we all know that gross carelessness in having deeds registered was formerly far from uncommon, especially " out in the provinces."

The 192 acres were, doubtless, disposed of by complainant, her husband, and brothers, and their deed or deeds left unregistered. Subsequent conveyances were probably duly recorded, while the lapse of time seemed to render the absence of the original ones unimportant. It was incumbent upon the defendants to establish the existence of this portion of the tract, undisposed of by the original owners. They have failed to do so. We are, therefore, not called on to declare what figure it would have cut in the case if it had been made out.

Two questions remain,—that of a proper restitution of purchase money, and that as to an allowance for improvements. The purchase money paid for the 92 acres sold to Black, and for the 147 acres sold to R. C. Suttle, was the estimated value of the entire fee simple of the lands. One-third of this was paid, either to complainant herself or to her husband with her consent and by her direction. The purchasers got all they bargained for, except complainant's remainder interest in an undivided one-third of the lands. Upon the death of C. K. Gillespie, complainant will reclaim this much of what was paid for. Therefore, for so much of the purchase money of the two tracts as represented the relative value of complainant's remainder, the purchasers received no consideration. Such rights as they had they transmitted to their successors in interest, the present holders. Upon the plainest principles of equity, before complainant can be allowed to deprive them of this portion of the lands, she must make a proper restitution of the purchase money that was received therefor by herself and her husband. Asking equity, she must do equity. 2 Story's Eq. Jur., sec. 707.

The principle is none the less applicable where the transactions sought to be avoided are those of infants, lunatics, or married women—persons under disability. *Smith* v. *Evans*, 5 Hum., 70; *Alston* v. *Boyd*, 6 Hum., 508; *Pilcher* v. *Smith*, 2 Head, 208; *Hilton* v. *Duncan*, 1 Cold., 320; *Wright* v. *Dufield*, 2 Baxter, 218.

In *Pilcher* v. *Smith*, it did not distinctly appear whether the money was paid to the husband for himself or as the agent of his wife; but, surely, that was immaterial, as, in either event, he had the right to appropriate it to his own use the moment he received it.

It is well settled by these authorities that the purchase money received for land, where the sale is avoided, may be made a lien on the land.

It is objected by complainant, that it is now impossible to say what part of the purchase money was paid for the wife's remainder. But this is not difficult, in theory at least. From the one-third of the purchase money paid by Black and R. C. Suttle for the two tracts in question, as the price of the fee simple of complainant's interest, deduct the life estate of C. K. Gillespie, as of the dates of the sales, and the residue will represent what was paid for complainant's remainder. The proportion of the value of the husband's life estate to that of the fee simple, can be ascertained with the aid of the tables, his age being carried back duly. What is found to have been paid for complainant's remainder, should be a charge upon her interest, as of the dates of the original sales. The proper amount can be ascertained by a reference.

Complainant cannot be charged with anything on account of any improvements that may have been made upon her lands. For the decisions upon the subject of an allowance for improvements to parties evicted, see *Bristol* v. *Evans*, 2 Tenn.,

341, and *Townsend* v. *Shipp's Heirs,* Cook, 300, (Cooper's Ed.), and the editor's notes to these cases; also *Jones* v. *Perry,* 10 Yer., 59; *McKinley* v. *Holiday,* Ib., 479; and *Gee* **v.** *Graves,* 2 Head, 245.

The substance of the law upon this subject is embodied in sec. 3261 of the Code: " Persons holding possession in good faith under color of title, are entitled to have the value of their permanent improvements set off against the rents and profits which the plaintiff may recover.'

The claim for improvements may be asserted in equity (sec. 3259), *Avent* v. *Hord,* 3 Head, 462. But, whether asserted at law as a set-off against rents and profits, or in equity, the extent of the claim is the enhancement of the land by reason of the improvements, not exceeding the amount of the rents and profits.

In the present case, as the possession of the defendants has been, and until the death of C. K. Gillespie, will be, perfectly lawful, no rents and profits will be recoverable against them at the date to which the present decree will apply; and where there are no rents and profits, there can be no allowance for improvements.

The costs of the cause in both Courts will be borne by the defendants. The decree of the Chancellor will be reversed, and a decree entered here in conformity with this opinion.

After the foregoing opinion had been delivered, applications were made to the Court to reconsider portions of it, and upon a subsequent day of the term the following opinion was delivered by R. McPHAIL SMITH, Sp. J.:

## SAME *v.* SAME.

The head-note of this opinion is incorporated with that of the preceding one, which see.

The opinion heretofore delivered in this case has not had the good fortune of pleasing either side. Complainant asks for a reconsideration of that part of it imposing upon her the duty of restitution of purchase money; and the defendants of that part of it denying to them compensation for improvements.

It is argued that complainant cannot be required to make any restitution of purchase money, because neither John Black, the original vendee of one of the two tracts in question, nor the personal representative of R. C. Suttle, the original vendee of the other tract, is before the Court, for which reason the equities between the parties involved cannot be comprehensively adjusted. But if a proper restitution of the purchase money is the condition of the relief sought by complainant, then if, for want of parties, the Court cannot impose the condition, it follows that, for want of parties, it cannot grant the relief. Complainant's conten-

tion would seem to be that her bill has been so deftly framed as to obtain the relief and yet elude the condition.    That this *is* the condition of this relief, is established by the cases cited in the foregoing opinion.

Thus, in *Hilton* v. *Duncan*, 1 Cold., 321, it was said that it would be a fraud for a married woman to avoid her contract without restoring the purchase money, and that, "as an incident to the rescission," the Court will order the repayment of the money, and will declare a lien to secure it."

In *Wright* v. *Dufield*, 2 Baxter, 222, the following language was used:

"On the rescission of the sale, it is the settled practice in this State to require the vendor, *as incident to the relief granted him*, to restore the purchase money he has received, and the amount paid upon the purchase will be held a lien upon the land, even against a lunatic or a married woman." It was added:  "The vendor is bound, upon an immutable principle of natural justice, to refund the purchase money, before being entitled to demand back the property sold."    And it was said that "the mere effort to avoid the contract without restoring the purchase money, is itself a fraud which will not be permitted."

In the next paragraph, the proper limitation is stated, that "the contract on the part of the purchaser must be free from the imputation of fraud or imposition."    The sale there appeared to have been made through over-confidence of the wife in

the husband; but as the purchaser did not appear to have been in fault, the restitution of the purchase money was decreed.

For a case falling within the limitation, see *Rhea* v. *Martin*, 1 Leg. Rep., 292, where the wife was moved by undue influence of her husband, co-operating with the purchaser's threat of depriving her of the land by a Chancery suit, unless she consented to sell it.

In *Wiley* v. *Heidell*, 12 Heis., 100, it was said that a party would not be allowed to avoid his contract without restoring the purchase money, and that the uniform practice had been to declare a lien upon the land to secure its payment. That this was to be done in the decree of rescission, and " *as an incident thereto.*"

No shadow of unfairness rests upon the present case. The complainant's attorneys in fact were her brothers, and her interest was sold at the same time with theirs in lands belonging to them jointly. She was privily examined as to the execution of her powers of attorney, and acknowledged that she acted freely, voluntarily, and understandingly, and without constraint from her husband. At that time, and indeed until the decision in *Gillespie* v. *Worford*, in 1865, it was generally supposed that such powers of attorney were valid. And lastly, N. G. Taylor, one of these brothers, complainant's witness, deposed that he paid over her share of the purchase money, partly to herself and partly to her husband by her consent and direction.

Unquestionably, the vendors and the vendees acted in perfect good faith, both believing the title communicated to the latter to be perfect. The law was, some eighteen years afterwards, settled contrary to the general understanding at the time, and thereby complainant is enabled to repudiate her powers of attorney, and at the death of her former husband, C. K. Gillespie, she may reclaim her lands; but she cannot exercise this hard right without complying with its condition. The lands must be charged with a proper restitution in favor of the holders of them.

This being the condition of the relief sought, complainant's objection to this condition is, in substance, an objection to her own bill for want of parties, which, if successful, would necessitate the dismissal of the bill, or its remanding, for the necessary new parties to be brought in by supplemental bill.

It is inadmissible for complainant to object to her own bill for want of parties. In 1 Dan. Pl. and Pr., 293, it is said: "The objection for want of parties ought to proceed from a defendant; for it has been decided that the plaintiff bringing his cause to a hearing without proper parties cannot put it off without the consent of the defendant."

Of course, if no decree can be made doing justice between the parties to the suit without affecting the interest of absent parties, the Court will not proceed, but will itself take the exception, and remand the case to have the necessary additional

parties brought in. But the mere non-joinder of persons who might indeed have been proper parties, but whose absence does not prejudice the right of those who are before the Court, will not, even at the defendant's instance, constitute a fatal objection at the hearing. Story's Eq. Pl., sec. 74a.

If the Court can make a decree at the hearing that will do entire justice to all the parties, and not prejudice their rights, notwithstanding the non-joinder, it will not then allow the objection to prevail. Ib., sec. 237.

Our Code provides that a bill shall not be dismissed for want of parties, unless the objection be made by motion to dismiss or demurrer.

But we do not think that the bill in the present case was originally objectionable, even at the instance of the defendants, for want of parties. Because if additional parties had been made, the decree might have been more comprehensive, it does not follow that these were necessary parties. Thus, a mortgagee may foreclose, or a vendor's lien be enforced, against the heir alone, without bringing in the administrator, though the personalty is the primary fund for the satisfaction of the debt. Story's Eq. Pl., sec. 76b; *High* v. *Batte*, 10 Yer., 188; *Edwards* v. *Edwards*, 5 Heis., 123.

A mortgagor seeking to redeem, where the mortgage has been assigned, may proceed against the last assignee alone: Story's Eq. Pl., sec. 189. The *status* of the complainant here somewhat resembles

that of a mortgagor seeking to redeem from the assignee of the mortgagee who is in possession. She asks to have declared her right to reclaim lands, upon the condition (annexed by the law) of making a proper restitution to their holders—this being made a lien upon the lands—just as the mortgagor asks to have his rights declared to reclaim lands upon making a proper repayment of what is a charge upon the lands. In neither case, unless an account of rents and profits received by intermediate parties is required, is there any necessity of making any but the last holders of the lands parties. In the present case, as complainant's right to possession will not commence until the time to which this decree relates—the death of C. K. Gillespie—there can be no question of rents and profits.

It is said that there is no privity between complainant and defendants, and that therefore she cannot be required to make any restitution directly to them, to be charged as a lien upon her lands in their favor. "The term privity denotes mutual and successive relationship to the same rights of property:" 1 Green. Ev., sec. 189. It is true that the defendants have not succeeded to any of the property rights of complainant in these lands. But this is because none of these rights passed to the original vendees, John Black and R. C. Suttle. The *hiatus* in privity occurred upon the invalid sales to them. Yet, unquestionably they would have been entitled to restitution of purchase money,

to be secured by a lien on the lands, had these been reclaimed in their hands.

Now, the defendants are in perfect privity with them, and represent, as the present holders of these lands under them, all the rights as against complainant, and as against the lands themselves, which the original vendees would have had if they were still the holders of the lands.

The right of restitution clings to the lands themselves. The restitution is to be made a lien on the lands. In the language of this Court in *High* v. *Batte*, 10 Yer., 188, with reference to the vendor's lien, it "attaches to the land, so that the land, so to speak, is debtor." Its practical value consists rather in the charge against the land itself than in a personal claim against the reclaimant, who is often a person under disabilities, exempt from personal liability. If the land is disposed of, this dormant lien, to be quickened into life by the exercise of the true owner's right of reclamation, passes with it, and the holders who are finally evicted are entitled to the benefit of the lien. Nor does it matter that the last holders may have the warranties of their predecessors up to the original invalid sale. So much the better for them if they have. But this no more interferes with their right to the benefit of the lien on the land itself, for restitution from the reclaimant, than the recourse which the holder of a vendor's lien note

9—VOL. 4.

may have upon intermediate endorsers interferes with his right to resort first to the land itself. The personal liability of the warrantors is additional to the lien on the land itself.

Suppose that a married woman's land is invalidly sold, and then resold for cash, *without* warranty, and then reclaimed. Has the last purchaser no right to restitution? The first purchaser would have been entitled to this equity. Can his sale have annihilated it, so that now the woman may keep what she got for the land and take back the land too? Surely not. She must make due restitution. The restitution must of course be made to the last purchaser, from whom the land is taken. It is to be charged on the land itself. The land is virtually the debtor for it. If the last sale had been *with* a warranty, how could that have altered the case as to the lien upon the land itself?

It is said that the price, in the present case, may have been discounted on account of the contingency of reclamation. But, if so, the right to proper restitution upon the reclamation will have entered into the estimate. The amount of the restitution, presently to be considered, is something fixed, not requiring for its ascertainment, where, as in the present case, there is no question of rents and profits, any consideration of equities between intermediate parties, and the warrantor, if there was a warranty, will receive the benefit of it in reduction of his liability. The restitution will belong to the holders of the lands,

under the sale that is avoided, in the proportion of their respective interests at the time.

It is not perceived how the want of parties, if it existed, could avail complainant here, in any view of the case. For, suppose that, for this reason, the Court had now only to declare complainant's right to reclaim her lands at C. K. Gillespie's death, without saying anything about the condition of restitution, yet this would not enable her ultimately to elude the restitution, any more than if she had waited until her right to possession had accrued and then brought ejectment for her lands. For what would have been the result of that line of action, see *Pilcher* v. *Smith*, 2 Head, 208. At most, the Court would now have to leave open the question of restitution, thereby only postponing it until the proceedings hereafter to be instituted by complainant to obtain possession of her lands. We think that the question can be passed upon now between the parties who are before the Court.

It would be strange if, in a case like this, where the original conveyee might have been dead, and his estate wound up, possibly for fifty years, and his administrator dead, and *his* estate long since wound up, the original administration had to be reconstituted merely to provide a technically regular *conduit* through whom the purchase money to be refunded upon reclamation of the lands invalidly sold might reach the pockets of the parties ultimately entitled to it, all of these being before the Court.

It is asked by what process is it to be ascertained what amount was paid for complainant's remainder? Her one-third of the purchase money of the lands sold by her brothers, her husband, and herself, less the husband's life estate in this third, was what was paid for the wife's remainder. The problem is, to determine the husband's life estate. And the principal question here is, what must be taken as the length of the husband's life subsequently to the sales to Black and R. C. Suttle, C. K. Gillespie being still alive.

If these sales had been made with reference to the separate values of the husband's life estate and the wife's remainder, then these values would have to be estimated as of the dates of the sales, according to the manner set forth in *Carnes* v. *Polk*, 5 Heis., 244. See also Scribner on Dower, 612, 655, treating of the assignment of a money equivalent for dower. But as there was no such separate reference, the understanding being that the entire fee simple of the three joint owners was purchased, and simply *that* being valued, we think that the valuation of the life estate of C. K. Gillespie at these dates ought to be made upon the basis of his actual length of life subsequently to the sales, and not upon the basis of such an estimate as must have been made at these dates if the sales had been made with reference to the life estate and the remainder. And as C. K. Gillespie is still alive, and the counsel of the complainant intimate that his days are likely to be indefinitely

prolonged, and the decree in this case is to apply to the time of his death, when new proceedings, upon the basis of the rights now declared, will be necessary for their realization, it seems best to remit the ascertainment of the value of this life estate, and consequently of what was paid on account of complainant's remainder, to these new proceedings, when the actual length of life, which would now have to be guessed at, will have become certain.

This disposes of all that has been suggested in behalf of complainant. But upon the further reflection that has been bestowed upon the subject since the application for a reconsideration, a question has occurred to us which has not been without difficulty, especially as it was not noticed by the counsel, who have discussed so ably and exhaustively the residue of the case. This question is, whether the restitution to be made upon reclamation of lands invalidly sold must always consist of the full amount of the purchase money and interest, however long ago the sale may have been, and however greatly the land may since have depreciated; or whether there should not be some limit short of this, and if so, what this should be.

When the former opinion was prepared, this was not recognized as a practical question in the case; and, as stated, it was not raised by counsel. But it now appears to be not impossible that what will be found to have been paid for complainant's remainder, with interest all the way down

to C. K. Gillespie's death, may exceed the value at that time of complainant's undivided one-third of these lands, so that we feel called upon to dispose of the question that has just been stated.

Put an extreme case. Suppose an invalid sale of land by one then, and for many years continuously thereafter, under disability, just before the termination of which the land is resold for a small portion of the original price, it having greatly depreciated, or valuable improvements thereon having been destroyed. Immediately after the termination of the disability, the land is reclaimed. Must the last purchaser receive the original purchase money with interest all the way down, amounting, possibly, to ten times what he paid for the land, with interest. Such a requirement would, of course, destroy the right of reclaiming the lands. And, in cases where it fell short of this, it might yet often considerably overpay the party evicted. The last purchaser, who is evicted, is the only party entitled to compensation. If he is indemnified, the requirements of equity are met. He ought not to be over-indemnified.

What, then, does the law regard as full indemnity upon an eviction? Our rule is, where there is a warranty of title, to give the purchase money and interest: *Elliott* v. *Thompson*, 4 Hum., 99. Some states give the value of the land at the time of the eviction, but our rule is as stated: See 4 Kent, marg. pp. 475–7, and notes. This, then, in legal contemplation, is indemnity for the loss of the land.

Aiken *v.* Suttle.

If the last purchaser took no warranty, or bought under fi. fa., or at Chancery sale, where no warranty was to be had, still if when the land is reclaimed he can get back his purchase money and interest, he must be regarded as indemnified, since this is all he could recover from his vendor if he had a warranty of title. We think, then, that the restitution to be charged upon the land in favor of the last ·holder, when the land is reclaimed, ought never to exceed his purchase money with interest. Treating that as having been made with a warranty, whether in fact there was one or not, and limiting the indemnity upon eviction to the last purchase money and interest, no injustice can be done. This limitation may sometimes seem to operate somewhat arbitrarily, and it may sometimes permit the reclaimant to retain some of the consideration received for the land reclaimed, but, upon the whole, it appears to be equitable, and it is based upon an obvious analogy. Its application in the present case will require the disentanglement of some complication.

John Black bought the tract of 92 acres from complainant, her husband, and brothers, in 1846, and R. C. Suttle that of 147 acres in 1847. Black sold the 92 acres to R. C. Suttle in 1857. After the death of R. C. Suttle, 100 acres of the 147 acres were, as part of the tract of 508½ acres, purchased by L. D. Suttle, under the decree in set-tlement of the estate of the former. The time of this sale does not appear. So that 47 acres of

the 147 were last sold in 1847, in the original sale; the other 100 acres, under the decree just mentioned, and the 92 acres, in 1857. Complainant's interest in these lands was an undivided one-third.

It must not be forgotten that we are dealing with a remainder. It was only this remainder of which the original sales were invalid. We have first to ascertain what was paid on account of this remainder as included in the purchases of Black and R. C. Suttle in 1846 and 1847. This, with interest from the dates of these sales, will be the *maximum* charge that can be made upon complainant's interest in these lands, in favor of complainant.

For the purpose of applying the limitation that has been explained, the amounts as to the two tracts in question must be kept distinct, and then the amount as to the tract of 147 acres must be divided into two portions in the proportion of 47 to 100, as 47 acres of this tract were not resold, while 100 acres of it were subsequently sold, as a part of the tract of 508½ acres purchased by L. D. Suttle under the decree in settlement of R. C. Suttle's estate.

The portion applicable to the 47 acres cannot be reduced, there having been no subsequent sale of the 47 acres. But, it may be that what was paid on account of the remainder in an undivided third of the 100 acres, with interest from the time of L. D. Suttle's said purchase, will be less than what was paid on account of this part

of the remainder on the original sale of the 147 acres to R. C. Suttle, in 1847, with interest from that much earlier date, although, owing to the consumption of the candle of the particular estate in the meantime, the relative value of the remainder will have been constantly increasing, and moreover the lands themselves may have been enhancing.

The time of L. D. Suttle's purchase of the 508½ acres being ascertained, it must then be determined what part of the purchase money therefor was applicable to the 100 acres (of the 147 acres,) included therein, and then the life estate (for C. K. Gillespie's life) in one-third of this part of the purchase money being estimated as of that date, and deducted from this third, the residue will represent what was then paid on account of complainant's remainder in an undivided one-third of the 100 acres; and this residue, with interest from that time, will be compared with what was paid for the remainder in this portion of the 147 acres in 1847, with interest from that date, which will not be allowed to exceed the subsequent amount with interest.

In the case of the 92 acres, the remainder therein, with interest from the date of the sale to John Black, in 1846, will be compared with the remainder therein as of 1857, the time of the last sale of the land, (by Black to R. C. Suttle), with interest from that date, the former amount not to exceed the latter.

The amount of the restitution, when ascertained, will be made a lien upon complainant's one-third of the two tracts, of 92 acres and 147 acres.

As to the matter of improvements, the defendant insists that in the partition of the lands hereafter, between them and complainant, the shares containing the improvements ought to be alotted to them, and that the shares ought to be so laid off as to produce this result, citing the case of *Reeves* v. *Recves*, 11 Heis., 675.

We do not mean, in refusing to charge complainant's interest in these lands with improvements, to intimate, still less to adjudge, that, in the future partition of the lands, no regard is to be paid to the fact that the improvements were made by the defendants, or their predecessors under the sales avoided by complainant. We do not think that any adjudication of this matter can be made in the present suit. It will be time enough to deal with it in the partition suit, when that comes to be disposed of.

The question how the lands are, under all the circumstances, to be equitably partitioned, will belong to the partition suit.

We have now disposed of all that is properly before us in the present case. In the language of counsel—"Sufficient unto the day is the evil thereof."

---

Aiken *v.* Suttle

---

FREEMAN, J., delivered the following dissenting opinion ·

Never having assented to the correctness of the opinion in the case of *Gillespie* v. *Worford*, 2 Cold., 632, I take occasion to state a few of my objections to the ruling of the Court.

In the first place, I hold that where the married woman is authorized to convey by deed, as she is by our law beyond question, then she may as well make that deed by an agent or attorney in fact as in person. That authority to make the deed includes the usual and known methods and agencies by which such an act is done, and by an agent or attorney is, and was when she was authorized to make a deed, one of the well known and usual means by which all parties competent to make deeds were accustomed to perform such acts. In a word, I hold that what a party can do by himself he can do by another, or an agent. The maxim of our law, that what a man does by another is done by himself, I think strictly applicable to the question.

The fallacy of the argument of Judge Milligan in the opinion referred to, is in following authorities holding that a married woman could not make a valid power of attorney, which are based on the fact that, by reason of her coverture, she was incompetent to contract. The want of application of the principle to the case where she did have the power to make the contract, I think is clear, she

has the power to do the major act, that is, make the deed of conveyance, and it seems to me this necessarily involved the power to do the minor act, to-wit: to perform all that a natural and usual means by which such an act may be done, and that the end includes the means by which it may be effected. In view of the well known fact that such had been the universal understanding of the profession from the organization of the State down to the case in 2 Cold., and the additional fact that immense bodies of our lands had been conveyed by non-residents by means of powers of attorney executed by husbands and wives, I have always felt that decision was unwise in policy as well as erroneous in law.

But the main question debated before us, and in which I cannot agree to the conclusion arrived at by a majority of the Court, following the opinion in 2 Cold., is, that the husband's right by courtesy, or his vendee after the dissolution of the marriage by divorce, continues, and is not ended by the divorce.

The defendants in this case hold under a conveyance from the husband and wife. The wife's deed is held void by reason of having been made under a power of attorney. She was divorced and freed from disability many years since, married again, and is again discovert—the first husband remaining alive, the second husband being dead.

The statute of limitations, by reason of adverse possession of defendants, bars her right, in any

view, unless it be the vendees· of the husband and wife are entitled to an estate for life from the husband by reason of his deed, made while he was husband

The opinion combatted holds that a purchaser from the husband takes an estate for life, that is, an estate by courtesy, for the life of the husband by reason of the marriage, seizin of lands during coverture, birth of issue, independent of the continuance of the marriage relation. In other words, that though the woman does not die his wife, nor he survive her as her husband, still the same results follow, as if the facts were as stated. To this I cannot assent.

On marriage and birth of issue, the husband became tenant by courtesy initiate, but his estate is not consummate until death of the wife, which completes his title by the courtesy of England, is the language of all our books defining this estate: 2 R. C., 128.

It is the death of *his* wife that consummates the estate, not the death of a woman who is not his wife, it may be the wife of another man, as in this case, one who has been the wife of another, and may again form that relation. The case then being but initiate, and never consummate during the existence of the marriage relation, being dependent on, growing out of, and existing by means alone of the marriage relation must necessarily fail, when this relation ceases, as it seems to me. In fact, it never arises in completed form—it can

never do so—because the consummation can never take place. The condition of consummation can never happen, that is the death of his wife. She is not his wife, in fact may die the wife of another man.

Suppose the case of marriage, birth of issue, seizin of lands, and a divorce, then the marriage of another husband by the wife, it may be three or four births of children by each, and divorce, and then the wife dies, leaving the four or five husbands, and fathers living, who shall have courtesy in her lands? Shall their rights be fixed *pro rata?* If so, by what rule—the number of years they had her to wife or the number of children born to each? This is as troublesome a question, it seems to me, as the one propounded by the Sadducees on a certain occasion of the seven successive brothers who married the woman under the Mosaic law, and all died, and then the woman died. They said, "Whose wife shall she be in the resurrection?"

The question in the case put is, which of the husbands surviving is entitled to the relation? Whose wife was she when she died? I would say, as a matter of course, the husband whose wife she was at her death takes the estate incident to the marital relation. The principle of the opinion gives it to the man who has ceased to be husband, and who is declared by the decree of a competent Court to have forfeited the rights to the position of husband for misconduct. Husbands could, under

this view, well afford to be divorced from unde-
sirable wives who had estates, for no forfeiture of
the estate gained by the marriage will result, or
they may well sell all, and purchasers may well
buy, and be secure for his life, he may pocket the
proceeds and the wife cannot reach it until after
his death, though she may need and suffer poverty
by reason of his alienation.

It seems to be thought the rule is one benefi-
cial to the wife, but this is a mistake as a gen-
eral rule. If she is to be benefitted, generally it
would be by being entitled to her estate at once,
for ordinarily it may be assumed she will die as
soon as the husband. In this case it happens she
is still alive, but it may yet be that her husband
will live as long as she does. So we may declare
her right, and she not live to enjoy it.

I need but say, the argument that the husband's
vendee can possibly take an estate beyond that
which the husband had to sell, stand higher or held
by a broader title, is one that I am unable to
comprehend. It may be supported by reason, but I
am frank to say I have not been able to see the basis
on which it can be rested. Until it can be shown
that a man can convey what he has not himself,
that a stream can rise above its source, I shall
never be able to see how the vendee of the hus-
band can take an estate from the husband of
greater dignity or duration than that of the hus-
band himself. I need not cite or comment on au-
thorities. I believe it is not claimed that any case

but the one mentioned holds the, doctrine contended for, and this sustained by the principle of the 4th Sneed case, cited in the opinion incidentally referred to in other cases. I have examined a number of authorities, and all hold in accord with the view I here maintain.

I can see no strong equity in favor of the rule contended for—no reason of public policy—and when a rule is totally inconsistent with sound reason and legal logic, I feel no hesitancy in overruling it, however often it may have been declared, unless it was because it was the basis of property titles, which public policy demands should not be disturbed

Here the only effect of adopting this illogical, and, as I think, unsound rule, is, not to sustain and quiet titles, but simply to destroy titles long acquiesced in for which a valuable consideration was paid, and on which the parties had rested with confidence for a quarter of a century.

I have felt the force of the argument drawn from the principle *stare decisis*. It is one always presented by ingenious counsel, and often referred to, and properly by Judges in support of their opinions. However, I must say my own observation is, that generally orthodoxy on this doctrine consists in adhering to it, when it supports the views of the particular Judge preparing the opinion, and disregarding its obligations when the decisions do not serve this useful end. For this reason, I do not

feel that absolute deference to the authority of this rule that I might otherwise have felt.

Believing the principles of the case of *Gillespie v. Worford* to be radically wrong, I think the case should be overruled, and dissent from the opinion of the majority holding the contrary